## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| **A.S. by and through his next friend**<br>**and mother, ANGELA GERMAINE**<br>**SPENCER** | § <br> § <br> § <br> § | |
| **Plaintiffs,** | § <br> § | |
| **v.** | § <br> § | **CIVIL ACTION NO.:** <u>**2:18 -cv-00297**</u> |
| **MARSHALL INDEPENDENT**<br>**SCHOOL DISTRICT and NANCY**<br>**FESSLER, Individually, KENNY**<br>**BARRON, Individually and KEVIN**<br>**GRAY, Individually** | § <br> § <br> § <br> § <br> § | |
| **Defendant.** | § | |

## FIRST ORIGINAL COMPLAINT

**NOW COMES** A.S. by and through his next friend and mother, Angela Germaine Spencer, (collectively termed "Plaintiffs" or "A.S." herein) and files this *First Original Complaint* alleging that the Marshall Independent School District (hereinafter referred to as "MISD" or "School District") and Nancy Fessler, Individually, Kenny Barron, Individually and Kevin Gray, Individually, (all collectively termed "Defendants" herein) violated the various rights of A.S., as more specifically pled herein. Plaintiffs reserve the right to re-plead if new claims and issues arise upon further development of the facts, as permitted by law. In support thereof, Plaintiffs would respectfully show this tribunal the following:

## I. BRIEF INTRODUCTION TO THE CASE

1.     In the educational world, it's called the *Schoolhouse to Jailhouse Pipeline*. It is the unspoken conspiracy among school district officials to move a child they do not like, or find bothersome, out of the classroom and into a prison cell. The practice is simple, time-tested

and true. A staff member purposefully provokes a child, gets the child to react and better yet, overreact, and then when the child requires some type of physical intervention, the inevitable happens. In trying to protect themselves from assault, the child touches, pushes or even hits the teacher. Once that happens, the plan is fulfilled, and the student is charged with assault on a public servant, a felony. The police are called, the child arrested, brought to juvenile detention center and charged. If the District is really lucky, so they think, the offense is sufficiently severe or reoccurring, that the child is removed from the school permanently. That is exactly what happened to A.S.

2.      This "Schoolhouse to Jailhouse" conspiracy is particularly troublesome because it disproportionately affects African-American children and children with emotional disabilities. A.S. is both.

3.      As such, A.S. brings forth this complaint based upon violation of his rights pursuant to *Section 504 of the Rehabilitation Act of 1973*, 29 U.S.C. §794 ("Rehab Act" or "Section 504") and the *Americans with Disabilities Act* ("ADA"), 42 U.S.C., §12101, et seq. for claims related to discrimination based upon disability.  In addition, he also pursues claims related to discrimination based upon race, pursuant to Title VI of the Civil Rights Acts of 1964 codified at 42 U.S.C. §2000d et seq. Last he also brings forth claims against Nancy Fessler, Kenny Barron and Kevin Gray all individually, and the Marshall Independent School District as well, for violation of his civil rights pursuant to the United States Constitution as contemplated by Section 1983 of the Civil Rights Acts.

## II. JURISDICTION

4.      Jurisdiction is conferred upon this Court pursuant to 28 U.S.C.A. §§ 1331 and 1343 because the matters in controversy arise under the United States Constitution and laws of the United

States.

## III. <u>VENUE</u>

5.    Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs claims occurred in the Eastern District of Texas, Marshall Division.

## IV. <u>PARTIES</u>

6.    A.S. lives in Texas and at all times pertinent to this case he lived within the Marshall Independent School District catchment area with his mother Angela Germaine Spencer ("Ms. Spencer"). They currently live in Tyler, Texas.

7.    The Marshall Independent School District is a state agency responsible for oversight, rule making, compliance with state and federal law, and control of the public primary and secondary schools in Marshall, Harrison County, Texas. They may be served by and through their Superintendent, Dr. Jerry Gibson, at 1305 E. Pinecrest, Marshall, Texas 75670. Plaintiffs reasonably believe they will be represented by the Honorable Meredith Prykyl Walker, and other Counsel with the Law Firm of Walsh, Gallegos, Trevino, Russo, & Kyle, P.C. at 105 Decker Court, Suite 600, Irving, Texas 75062.

8.    Nancy Fessler was the Principal of William B. Travis Elementary in the Marshall Independent School District for all times pertinent to this case. Plaintiffs reasonably believe she may be served at the Marshall Independent School District at 1305 E. Pinecrest, Marshall, Texas 75670.  Plaintiffs also reasonably believe they will be represented by the Honorable Meredith Prykyl Walker, and other Counsel with the Law Firm of Walsh, Gallegos, Trevino, Russo, & Kyle, P.C. at 105 Decker Court, Suite 600, Irving, Texas 75062.

9.    Kenny Barron was the Principal of the Disciplinary Alternative Education Program ("DAEP") in the Marshall Independent School District for all times pertinent to this case. Plaintiffs reasonably believe he may be served at the Marshall Independent School District at 1305 E. Pinecrest, Marshall, Texas 75670. Plaintiffs reasonably believe they will be represented by the Honorable Meredith Prykyl Walker, and other Counsel with the Law Firm of Walsh, Gallegos, Trevino, Russo, & Kyle, P.C. at 105 Decker Court, Suite 600, Irving, Texas 75062.

10.    Kevin Gray was an employee at the Marshall Independent School District for all times pertinent to this case. Plaintiffs reasonably believe he may be served at the Marshall Independent School District at 1305 E. Pinecrest, Marshall, Texas 75670.  Plaintiffs reasonably believe they will be represented by The Honorable Meredith Prykyl Walker, and other Counsel with the Law Firm of Walsh, Gallegos, Trevino, Russo, & Kyle, P.C. at 105 Decker Court, Suite 600, Irving, Texas 75062.

## V. STATEMENT OF FACTS

A.    ABOUT A.S.

11.    A.S. was born on December 15, 2006. He is currently 11 years old.

12.    A.S. is in the fifth grade. He previously attended Travis Elementary School in the Marshall Independent School District, the Defendant School District in this complaint. Currently, he attends Owens Elementary School in the Tyler Independent School District.

13.    A.S. is very active in community sports, like football and basketball. In fact, he plays with two AAU basketball teams. He also participates in a traveling team. He also plays organized football and last fall won most valuable defensive player of the year.

14.    He also does acting and modeling with Casting360, a company that seeks to connect

available talent and talent scouts in various parts of the country, including Dallas, Texas where A.S. participates.

15.    At church, A.S. performs in mimes and participates in other youth activities, including church camping trips.

16.    Outside of school, A.S. thrives as an independent person. He never has a problem requiring physical restraint during any of these community events.

B.    ABOUT THE MARSHALL INDEPENDENT SCHOOL DISTRICT

17.    Marshall Independent School District serves about 5, 500 students in Marshall, Texas. The School District was founded in 1898.

18.    According to the MISD website, their Mission is "to improve outcomes for all students by providing leadership, guidance and support to school."[1]

19.    Additionally, "Marshall Independent School District envisions that each learner is equipped to successfully achieve his or her vision and be a productive, contributing citizen in a global society."

20.    According to the District's website, the ethnic demographic makeup of the Marshall ISD is approximately just above 37% African American, 36% Hispanic, 23% Caucasian, and 1% Asian – with 3% of all students identifying as two or more races.

21.    The ethnic demographic makeup Hopewell Middle School is approximately just above 39% Caucasian, 20% Hispanic, 1% Asian, and 36% African-American – with 4% of all students identifying as two or more races. Per the District's website, almost 70% of the students who

---

[1].  http://www.marshallisd.com/marshall_independent_school_district/about_misd

attend the school are economically disadvantaged[2].

22.    For the 2016- 2017 School Year the Marshall ISD reported to the Texas Education Agency ("TEA") that they had approximately 5,894 students, of which there had been 161 count of students removed to a DAEP. Ninety (90) students had mandatory DAEP removals and ninety (90) students had discretionary DAEP removals.[3]

23.    In further breakdown by race, there were 1,265 White students, which was 23.26 percent of the total number of students in Marshall ISD. In comparison, there were 2,015 Black students, which was 37.05 percent of the total number of students in Marshall ISD.

24.    When looking at the racial breakdown of the total number of DAEP actions, 35 actions were taken against White students and 110 actions were taken against Black students. Thus, 2.76 percent of White students had DAEP actions taken against them while 5.46 percent of Black students has DAEP actions taken against them.

25.    Additionally, when looking at the breakdown of special education students placed in DAEP, 43 special education students were placed in DAEP, while 157 non-special education students were placed in DAEP.

26.    Finally, when looking at the number of DAEP actions taken against economically disadvantaged students, actions were taken against 286 economically disadvantaged students compared to DAEP actions taken against 28 economically disadvantaged students.

27.    When analyzing the total number discipline actions taken in Marshall ISD in the 2016-2017 school year compared to the racial makeup of the actions, Black students were

---

[2]. A student is defined as "economically disadvantaged" if he or she is eligible for free or reduced-price lunch or other public assistance.

[3].   https://rptsvr1.tea.texas.gov/cgi/sas/broker

disproportionately reprimanded at a higher rate than their White peers.

C.    SCHOOL DISTRICT POLICIES AND PROCEDURES

28.    The School District has long had and re-authorized policies and procedures related to *Student Welfare* and keeping students free from Discrimination, Harassment & Retaliation, that address among other things, including student upon student bullying, harassment and assault.

29.    It sets out definitions of bullying and harassment, information about reporting allegations of bullying and harassment and investigatory procedures. It requires all allegations of bullying, harassment or assault based upon sex or gender or upon a student with a disability by a student or teacher, to be directed to the School District's Title VI, Title IX or Section 504 Coordinator, and the family be given that person's contact information and notice of their procedural rights.

30.    A District's investigation needed to be completed in a timely manner, usually less than 10 days, that a written report should be developed and interim action taken, as appropriate. The report must address whether or not prohibited contact occurred and must be filed with the relevant School District Official with a copy given to the family. If a student is not satisfied with the outcome of the investigation, they have the right to appeal the decision through the District's grievance procedure, with the TEA or even with the OCR  with the U.S. Department of Education.

31.    The School Board Policies also note a non-exhaustive list of potential corrective actions to provide the student based upon relevant caselaw, United States Department Office of Civil Rights ("OCR"} and Texas Association of School Board ("TASB") professional guidelines. They include a counseling or payment or community based counseling services,

psychological testing, training program for the victim and perpetrators, a comprehensive education program for the school community and counseling to the victim and perpetrators(s) and other services based upon the individualized needs of a student. Again, there needed to be a system in place to follow-up and determine if new incidents had occurred and the effectiveness of those provided. There is also discussion of increasing staff monitoring and assessment of the problem.

32.     The Board policies also recognize that students with disabilities have rights related to be free from bullying, harassment and assault based upon their disability pursuant to Section 504 of the Rehabilitation Act of 1973 and the Americans With Disabilities Act.

D.      THE USE OF SCHOOL RESOURCE OFFICERS ("SRO's)

33.     The School Resource Officer program in the United States is over sixty years old, but the program did not gain prominence until the 1990s in response to various school shootings.

34.     According to national data, SRO's can be found in approximately 35 percent of schools across America. They can be found at each school level (elementary, middle, and high schools), and they can be found in both suburban and metropolitan areas. Further, they are found in the schools regardless of enrollment size. In fact, most are embedded within a school to assist school administration with anything that would involve a criminal law component, such as the presence of a firearm on campus.

35.     At many schools, an SRO's role is clearly defined and the officer only engages students as part of a community policing project; they do not interfere or have any role with administrative discipline.

36.     However, in other schools, SRO's are expected to directly assist with student discipline.

E.      RESTRAINTS AND SECLUSION

37.    At public schools in Texas, federal law clearly lays out the framework for lawful restraints and arrests. Additionally, the Texas Administrative Code and the Texas Education Code state that "it is the policy of the state to treat with dignity and respect all students, including students with disabilities who receive special education services under TEC, Chapter 29, Subchapter A.  Restraints may only be used in an emergency, which is when a student's behavior poses a threat of imminent, serious physical harm to the student or others; or imminent, serious property destruction. It must be limited to the use of such reasonable force as is necessary to address the emergency and discontinued at the point at which the emergency no longer exists. A restraint must be implemented in such a way as to protect the health and safety of the student and others or deprive the student of basic human necessities and dignities

38.    Importantly, school employees must be trained in the use of restraint. If any personnel are called upon to use a restraint *in an emergency* and is not trained, they must receive training within 30 school days following the use of the restraint. Training should include prevention and de-escalation techniques. In short, the restraint should be a last resort, not the first option. Restraints must be documented, that is a written documentation, and parents must be notified when a restraint is used against their child.

39.    Moreover, Board Policies and Procedures preclude the use of seclusion, which is locking a student in a defined space, less than 50 square feet.

F.    THE 2015-2016 SCHOOL YEAR

40.    During the 2015-2016 school year, A.S. and his mother were homeless. In October 2015, they applied for the District's assistance under the McKinney-Vento Homeless Assistance Act, 42 U.S.C. §11301 *et seq.*

41.     On the application, Ms. Spencer indicated that she and A.S. were living with a friend. Ms. Spencer was aware of the criminal liability for falsifying information, and willingly signed the required document to enroll A.S. in the Marshall Independent School District.

42.     Once a person signs the McKinney-Vento application, the School District is required to take it at face value. In fact, under this Act it is illegal for a School District to stalk the homeless, or retaliate against them for using the Act or act in anyway to thwart the student's admission. Nevertheless, staff from the School District did all three.

43.     Over the course of the ensuing period, District staff would follow Ms. Spencer to and from work, her father's home and her residence, all with the intent to harass and interview neighbors to undermine that she was homeless.

44.     Krystal Moody, director of Human Resources at Wiley College, Ms. Spencer's place of employment, even wrote a letter to the District confirming that Ms. Spencer indeed lived in Marshall, Texas.

45.     Nevertheless, in a letter dated February 25, 2016, David Segers, the District's Truancy Facilitator, informed Ms. Spencer that MISD believed they had enough evidence to remove A.S. from the MISD.

46.     Ms. Spencer appealed and filled out another application indicating an address in the District where she and A.S. temporarily lived.

47.     The School District again threatened to remove A.S. from the MISD.

48.     Ms. Spencer then filed a complaint with the federal government alleging that the School District failed to follow the requisites of the McKinney-Vento Homeless Assistance Act ("The Act"), 42 U.S.C. §11301 *et seq.* After filing that complaint, the retaliation against A.S. slowly began.

49.     During the entire Spring Semester sf 2016, A.S. continued to receive services for his emotional condition and behavioral issues. A.S.'s mother learned that A.S. was being restrained often multiple times throughout the day, and often day after day by Mr. Gray and others

50.     Ms. Lewis sought and received legal services to address their concerns. Specifically, she was concerned about the District's violation of A.S.'s rights pursuant to the *Individuals with Disabilities Education Act* ("IDEA") regarding the over-use of restraints, as well as other educational issues.  She also was concerned her rights pursuant to McKinney-Vento Act were being violated.

51.     At the end of the spring semester for 2016, the parties met in a mediation and settled their concerns about the McKinney Vento Act and IDEA, and the agreed to set up a plan to address A.S.'s needs in his Special Education Program, particularly regarding the use and over-use of restraints.

G.      THE 2016-2017 SCHOOL YEAR: THE INCIDENT AND FOLLOWING RETALIATION

52.     Despite the agreement reached at the end of the Spring 2016 semester, Marshall ISD staff continued to use and overuse restraints on A.S., without following state law. In fact, A.S. was restrained close to 200 times during the 2016-2017 school year.

53.     Mr. Gray continued to be a staff member that was frequently involved in restraining A.S. On or about August 22, 2016, during a fire drill presentation, A.S. refused to go into the classroom. After being asked three times to go into the classroom, he finally went in. Nevertheless, Gray and Without cause to do so unnecessarily restrained A.S. yet again.

54.     That same day, A.S., upset at the prospect of either losing the opportunity to eat lunch with his friends or go to recess, became obstinate. Without cause to do so Gray restrained A.S.

*First Original Complaint*                                                                                            11

again.

55. A couple of weeks later, on or about September 6, 2016, A.S. became angry while doing a reading assignment in class. He chose not to work.  Mr. Gray again unnecessarily restrained A.S..

56. A few days later, on or about September 9, 2016, A.S. and Coach Felicia Chamness had physical contact. Instead of using alternative methods to de-escalate the situation, Coach Chamness and Mr. Southerlin immediately restrained A.S. with a team position hold.

57. Soon after they began the restraint, another teacher, Mr. Thomas Ramos, arrived and took the place of Coach Chamness. Later, Mr. James Townsend arrived and tried to de-escalate the situation with calming techniques, but by that time the damage had been done.

58. Later A.S. was placed in *Disciplinary Alternative Education Placement* ("DAEP") because of the incident.

59. A.S.'s mother filed a complaint with the Texas Education Agency because she believed A.S.'s rights were being violated by his placement in DAEP.

60. Even in DAEP, A.S. suffered the abuse of excessive restraints.

61. About a month later, the DAEP Principal, Defendant Barron, unnecessarily restrained. Mr. Barron is well over 6 feet and 300 pounds. At the time, A.S. was 9 years old, about 4 feet 3 inches tall and weighed between 65-70 pounds.  Barron also used excessive force during the restraint period.

62. That afternoon, A.S. came home from school with bruises under his eye and marks on his neck. He told his mother they occurred when he was restrained by Defendant Barron.

63. A.S. told her that in addition to restraints, Defendant Barron blew in his face, taunted him, and laughed in his face. Ms. Spencer complained to Mrs. Fessler, the Principal of Travis

Elementary. She did not respond, investigate or attempt to address her concerns.

64.     A.S. also told his mother that Defendant Barron put his knee into A.S.'s stomach during a another restraint again using unnecessary and excessive force. His mother complained to Mrs. Fessler about these issues as well. She did not respond, investigate or address these concerns, either.

65.     In fact, A.S. was being restrained everyday at DAEP by Barron and others. Additionally, DAEP staff would often call A.S.'s mother to take him out of school when they refused to take care of him.

66.     While A.S. was being restrained and also when he was taken out of school, he did not receive educational services. Ms. Spencer complained to Mrs. Fessler and Ms. Perkins about this problem also, but they did not respond or investigate these complaints either.

67.     About a month later, A.S. began having problems with the DAEP Assistant Principal, Mr. Lenny Jackson.

68.     On or about December 12, 2016, A.S. was participating in a math activity. He began to feel that Mr. Lenny Jackson was "tricking" him, and A.S. said as much. Mr. Jackson told A.S. that he "talked too much" and told him to stop talking.

69.     At that point, A.S.'s feelings were hurt and he felt unable to do his work. A.S. pushed his work aside and got up to walk around and calm down.

70.     In response, Mr. Lenny Jackson and Mr. Gray performed a full body hold restraint on A.S.. During this restraint, these teachers unnecessarily put a bean bag on top of A.S. When A.S. asked for the bean bag to be removed, they replied "no."  In addition, the restraint was excessive in that A.S. was injured.

71.     A.S. became bloody and was sent home.

72.     When he got home, A.S. told his mother that Mr. Gray *always* lays on him when restraining him. His mother complained to Mrs. Fessler. She did not investigate or respond to this complaint either.

73.     On December 15, 2016, A.S. turned 10 years old.

74.     On or about January 15, 2017, Principal Fessler received an email from mother noting that DAEP staff were repeatedly making comments stating that A.S. will be in "Kids Jail" soon. This reflects the mind set of staff more intent on steering A.S. into the criminal justice system and away from school, rather than away from it, as any good teacher should.

75.     When A.S.'s mother complained to Principal Fessler, Mrs. Fessler indicated that there would be an investigation into the matter mentioned above. However, Plaintiffs never received any results from the alleged investigation, so she reasonably believes there never was an investigation.

76.     Unfettered, DAEP's staff continued to overuse restraints and apply excessive force during these periods. At the end of the month, Ms. Spencer received another notice that A.S. had been restrained repeatedly.

77.     At the beginning of the next month, Ms. Spencer let the District know that A.S. was being represented by counsel to help investigate her complaints about the overuse of restraints. In addition she complained that A.S. was coming home from school with multiple injuries.

78.     Additionally, A.S.'s mother filed a complaint with School District Officials about the comments that staff were steering him to the juvenile system, but she never received a response on this issue either.

79.     As A.S. was being manhandled by staff on almost a daily basis, his classmates soon became equally emboldened and started bullying him also. Ms. Spencer complained to Mrs. Fessler,

about the bullying, but she did not respond or investigate this complaint either.

80.    At the end of March, the TEA completed their investigation into A.S.'s placement in DAEP. They found that ISD did not afford A.S. all of his procedural rights when they placed him in the DAEP. Further, the District did not ensure that all the staff restraining A.S. were trained in the use of restraint in accordance with Texas regulatory law.

81.    Not surprisingly, this report led to even more retaliation from Marshall ISD. Someone reported Ms. Spencer to Child Protective Services ("CPS") alleging that she neglected her son's medical needs. Ms. Spencer was able to show CPS the complaints were unfounded. She was able to discern the complaint came from a staff member at the Defendant School District.

82.    After the TEA report was released, A.S. experienced even more bullying from his peers and staff. On one occasion, he was kicked by another student in his self-contained classroom, and the staff did nothing to prevent the incident.

83.    Another time a student threw glass at him. Staff did nothing to prevent this incident either.

84.    Ms. Spencer was not informed of this bullying, nor was there any explanation given to the numerous injuries A.S. came home with. Mrs. Spencer complained that A.S. was not being kept safe, but as now was a common pattern, Fessler and other District staff failed to investigate or respond to her concerns.

85.    During the first week of May 2017, A.S. was again bullied and harassed by a classmate. When A.S. told his mother what happened, he begged her not to tell anyone at the School District because he was so afraid that staff would retaliate against him and "things will get worse."

86.    A few days later, Ms. Spencer sent an email to Ms. Perkins about the bullying and

harassment. Again, he received no response.

87. While the bullying persisted, A.S. also continued to be restrained by staff on almost a daily basis by Gray, Barron and others. On May 10, he was restrained for more than an hour, in violation of state law.

88.  The School District's reports and records reflect that each time A.S. was restrained, the restraint, on average, lasted thirty minutes to an hour. Sometimes he was restrained even longer, and  on multiple occasions, he was restrained multiple times a day, all in violation of state law.  They fail to show the restraints were necessary, were given only on a bona-fide emergency, nor was he released in a timely manner.

89. Ms. Spencer retained an Educational Advocate during this period on A.S.'s behalf. On May 10th, the advocate went to the School to check upon A.S.'s welfare.

90. After the Advocate left, District staff retaliated.

91. While A.S. was in class, he started playing with a pencil. He was not throwing the pencil at anybody and the pencil did not hit anybody.

92. Nevertheless, Mr. Gray restrained him with a full body restraint. A.S. was on his back, trying to free himself from the restraint, but Mr. Gray was also much bigger and heavier than A.S.

93. A.S. tried to free himself and more teachers came in to hold down his hands.

94. In his efforts to free himself, A.S. scratched one of the teachers holding his hands down, and he hit Mr. Gray, who was still laying on top of him.

95. At this point, another adult in the classroom called the police.

96. When the School Police Officers (SRO) came to the room, they handcuffed A.S., putting his hands behind his back.

97. The SRO's carried A.S. to their police car, all the while telling A.S. to calm down.

98.   A.S. cried out "let me go", but the police officer replied back, mockingly, "no".

99.   The police put A.S. in the backseat of the police car hand-cuffed, and drove him to the Juvenile Detention Center.

100.  A.S. was sent to the Juvenile Detention Center on charges of Assault on a Public Servant. At 10 years old, he was in the same center where teenagers up to 17 years old are held. He was kept in detention for a couple of days.

101.  On one of those days, he was brought into court wearing an orange jumpsuit and shackles.

102.  That day, the judge released A.S. home to his mother.

103.  Soon after, the County Attorney sent Ms. Spencer a letter to inform her that School District officials would drop the charges if A.S. was removed from the Marshall ISD. Ms. Spencer agreed to those terms and began the process to transfer A.S.

104.  Before A.S. left Marshall ISD, he still experienced discrimination and isolation from his peers. Specifically, he was forced to eat lunch by himself in a classroom. He was constructively secluded during this period.

105.  He was also prohibited from enjoying physical education with his peers. He had Physical Education in a classroom by himself. He was also constructively secluded during this period.

106.  Finally, Ms. Spencer was forced to pick up and drop off A.S. at an isolated side entrance to the school. If A.S. was late to school, he had an escort walk him to class.

107.  All of this treatment isolated A.S. from his peers, never giving A.S meaningful inclusion time with his peers and treating him in a disparate manner compared to his peers and was constructively secluded during this period.

G.    THE 2017-2018 SCHOOL YEAR

108.  During the 2017-2018 school year, A.S. was transferred to the Tyler Independent School

*First Original Complaint*                                                                        17

District.

109.   At Tyler ISD, administrators, teachers and staff had to work hard with A.S. to undo behaviors he brought with him from Marshall ISD, and they helped him build up self-esteem and trust.

110.   The hard work paid off. In addition to his community activities, A.S.'s academic achievements at Tyler ISD far exceed his experience at Marshall ISD. His grades are all passing, and for several six weeks he made the A and B honor roll. He also did well on the reading and math STAAR test.

111.   He had no significant disciplinary issues.

112.   The use of restraints was closer to never as compared to its over use at the Marshall ISD.

113.   A.S.'s successes at Tyler ISD show that he can thrive in a school environment just like he thrives in non-educational settings. The failures and omissions of Marshall ISD prevented A.S from thriving like he is clearly able to.

114.   For these reasons, Plaintiffs make the following claims against the Marshall ISD and the Individual Defendants.

## VI.  STATE ACTION

115.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth. In addition, each following paragraph and section, incorporates by reference as if fully set forth herein, the one above it.

116.   The School District Defendants were at all times and in all matters acting under color of state law when they permitted A.S. to be subjected to the wrongs and injuries set forth herein.

## VII.  UNCONSTITUTIONAL POLICIES, PROCEDURES, PRACTICES & CUSTOMS

117.   Plaintiffs incorporate by reference al the above related paragraphs, as well as those below,

with the same force and effect as if herein set forth.

118. Plaintiffs contend that the Marshall School District Defendants had a policy, procedure, practice and custom to not investigate parental complaints, violating A.S.'s rights pursuant to the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

119. Plaintiffs contend that the School District Defendant failed to sufficiently train staff in addressing the needs of A.S., a student with a disability, thereby violating his rights pursuant to the Fourteenth Amendment of the Constitution of the United States for which A.S. seeks recovery pursuant to 42 U.S.C. §1983.

120. Plaintiffs contend that Defendants failed to sufficiently supervise staff in addressing the needs of a student with a disability, like A.S., thereby violating his rights pursuant to the Fourteenth Amendment of the Constitution of the United States for which A.S. seeks recovery pursuant to 42 U.S.C. §1983.

121. During the relevant time period contemplated by this cause of action, the Marshall Defendants had an actual policy, practice and custom of conscious and deliberate indifference to federal law, federal and state administrative directives, and School Board policies and procedures in regard to the treatment of A.S., and such failures were a moving force in the injuries to A.S. for which A.S. seeks recovery pursuant to 42 U.S.C. §1983.

## VIII. CONSTITUTIONAL CLAIMS

A. VIOLATIONS OF THE FIRST AMENDMENT

122. Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

123. Plaintiffs contend that the acts and omissions of Defendant Fessler violated the rights of A.S.

pursuant to the First Amendment of the Constitution of the United States, when retaliating against A.S because his mother advocated on behalf of their rights and complaining about the failures of the School District Defendant to protect them, for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983 and 1988.

B.      VIOLATIONS OF THE FOURTH AMENDMENT

124.    Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

125.    Plaintiffs contend that the acts and omissions of Defendants Barron and Gray violated the rights of A.S. pursuant to the Fourth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

126.    The restraint of A.S. and force used against him by Defendants Barron and Gray was unreasonable.

127.    The restraint of A.S. and force used against him by Defendants Barron and Gray was unnecessary.

128.    Th restraint of A.S. and force used against him by Defendants Barron and Gray was excessive.

129.    Defendants Barron and Gray unnecessarily and constructively secluded A.S.

130.    Defendants Barron and Gray excessively and constructively secluded A.S.

131.    As such, the acts and omissions by Defendants Barron and Gray violated the rights of A.S. pursuant to the Fourth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983.

C.      EQUAL PROTECTION CLAUSE AND DUE PROCESS CLAUSE OF THE 14th AMENDMENT

132.   Plaintiffs incorporate by reference all the above related paragraphs, as well as those below, with the same force and effect as if herein set forth.

133.   The acts and omissions of Defendant Fessler singularly discriminated against A.S. when treating him in a disparate manner based upon race as compared to other Caucasian students similarly situated, thereby violating his rights pursuant to the *Equal Protection Clause* of the Fourteenth Amendment, for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983 and 1988.

134.   The acts and omissions of Defendant Fessler singularly discriminated against A.S. treating him in a disparate manner as compared to other students without disabilities, thereby violating his rights pursuant to the *Equal Protection Clause* of the Fourteenth Amendment, for which Plaintiffs seek recovery pursuant to 42 U.S.C. §1983 and 1988.

135.   Last, the facts as previously described demonstrate a *Conspiracy* between all the Individual Defendants both named and unnamed to retaliate against A.S. and cover up his injuries, violate A.S.'s rights under the *Due Process Clause* of the 14th Amendment to the U.S. Constitution.

## IX.   CLAIMS PURSUANT TO THE REHABILITATION ACT

136.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

137.   Due to A.S.'s status as a special education student, A.S. likewise is deemed "an individual with a disability" pursuant to Section 504 and its implementing regulations and directives.

138.   The Marshall ISD receives federal funds and thus follows the requisites of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794.

139.   The implemented regulations of Section 504 require that each state that receives

*First Original Complaint*                                                                                                21

disbursements, including the state's political subdivisions such as local school districts, must ensure all students with disabilities are given appropriate and necessary accommodations, pursuant to federal law and rules. To the degree that a policy or practice hinders honest consideration of a disabled student's unique and individualized needs, and fails to accommodate that child's disability and keep the student safe, it violates Section 504.

140.   Plaintiffs further assert that because the School District has failed to provide A.S. a safe and non-hostile educational environment, such failures as noted above, have together and separately, contributed to violating his rights pursuant to Section 504, and the federal rules and regulations promulgated pursuant thereto.

141.   In addition and in the alternative, the failures denoted herein by the School District were a gross deviation from professional standards of care.

142.   Furthermore, A.S. was thus a victim of intentional discrimination based upon disability by the School District.

143.   A.S. was a victim of retaliation because his mother advocated on his behalf.

144.   Lastly, the acts and omissions of the School District violated the regulations promulgated under Section 504 and as such create a private cause of action for its violations thereby.

145.   Such failures caused injury to A.S. and violated Section 504 thereby.

## X. CLAIMS PURSUANT TO THE AMERICANS WITH DISABILITIES ACT

146.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

147.   In addition and in the alternative to the above, the facts as previously described demonstrate violations of the *Americans with Disabilities Act*, 42 U.S.C. §12131, et seq ("ADA").

148.   A.S. is a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2).

*First Original Complaint*                                                                                                          22

149.  The School District is a "public entity" as defined in 42 U.S.C. §12131(1), and receives federal financial assistance so as to be covered by the mandate of the ADA.

150.  The School District and its schools are facilities and their operation constitutes a program and services for ADA purposes.

151.  Specifically, and separate and apart from his Section 504 cause of action, A.S. alleges that the School District failed and refused to reasonably accommodate and modify services as to him, in violation of Title II of the ADA.

152.  In addition, A.S. was a victim of retaliation because his mother advocated on his behalf.

153.  Such failures caused injuries to A.S. and violated the ADA thereby.

## XI. <u>TITLE VI CLAIMS</u>

154.  Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

155.  Title VI of the Civil Rights Act of 1964, codified at 42 U.S.C. §2000d et seq, and its implementing regulations, require that each state that receives disbursements, including the state's political subdivisions, not permit a student to be a victim of discrimination based upon race or racial stereotypes.

156.  Plaintiffs assert that because the School District has a policy, procedure and practice that A.S., a student of African-American Heritage was being steered into the criminal justice system, based upon his race and such failures all as noted herein, have together and separately, contributed to violating his civil rights pursuant to Title VI. Specifically, African American children are more likely to be given disciplinary detention, referrals to the Disciplinary Alternative Education Program "DAEP") and into the Juvenile Justice program Caucasian children similarly situated by the Defendant School District.

157.   Plaintiffs cause of action has additional credibility in light of the vast discrepancy in how he has flourished with the Tyler Independent School District as compared to how poorly he did at the Defendant School District.

## XII. <u>RATIFICATION</u>

158.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

159.   The School District ratified the acts, omissions and customs of all school administrators, educators, personnel, staff, and agents. As a result, the School District is responsible for the acts and omissions of all school administrators, educators, personnel, staff, and agents.

## XIII. <u>PROXIMATE CAUSE</u>

160.   Plaintiffs incorporate by reference all the above related paragraphs with the same force and effect as if herein set forth.

161.   Each and every, all and singular of the foregoing acts and omissions, on the part of the School District, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

## XIV. <u>DAMAGES</u>

162.   Plaintiffs incorporate by reference all the above-related paragraphs with the same force and effect as if herein set forth.

163.   As a direct and proximate result of the School District's conduct, A.S. has suffered injuries and damages, for which he is entitled to recover herein including but not limited to:

    a.      Physical pain in the past;

    b.      Physical pain in the future;

    c.      Loss of educational opportunities in the past;

    d.       Loss of educational opportunities in the future;

    e.       Medical expenses in the past;

    f.       Medical expenses in the future;

    g.       Mental anguish in the past;

    h.       Mental anguish in the future;

    i.       Mental health expenses in the past;

    j.       Mental health expenses in the future;

    k.       Stigma in the past;

    l.       Stigma in the future;

    m.       Physical impairment in the past; and

    n.       Various out-of-pocket expenses incurred by his family but for the acts and omissions of the School District.

## XV. <u>ATTORNEYS FEES</u>

164.    Plaintiffs incorporate by reference all of the above related paragraphs, as if fully set forth herein.

165.    It was necessary for Plaintiffs to retain the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees and costs pursuant to Section 504, the ADA, Title VI, 42 U.S.C. §1983, and 42 U.S.C. §2000d et seq.

## XVI. <u>DEMAND FOR A JURY TRIAL</u>

166.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in this matter.

## XVII. <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray in the manner and particulars

noted above, and that Defendants jointly and severally be required to fully compensate by an amount sufficient to fully compensate him for the elements of damages enumerated above, judgment for damages, recovery of attorney's fees and costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to Section 504, the ADA, Title VI, § 1983, and 42 U.S.C. §2000d et seq., together with pre- and post-judgment interest, and court costs expended herein and for such other further relief as the Court may deem just and proper in law or in equity.

Respectfully submitted,

*/s/ Martin J. Cirkiel*
Martin J. Cirkiel, Esq.
State Bar No.: 00783829
Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]

Anthony O'Hanlon, Esq.
Attorney & Counselor At Law
SBN 15235520
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133 [Telephone]
(903) 957-4302 [Facsimile]
aohanlon@somlaw.net [Email]

**ATTORNEYS FOR PLAINTIFFS**